ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 11, 2015

**Nos. 15-3016, 15-3017**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee/Appellant*,

FOKKER SERVICES B.V.,

*Defendant-Appellant/Appellee*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA (NO. 14-CR-121 (RJL))

_____

**BRIEF OF COURT-APPOINTED *AMICUS CURIAE*
IN SUPPORT OF ORDER BELOW**

_____

DAVID W. DEBRUIN
   *Lead Counsel*
ADAM G. UNIKOWSKY
JULIE STRAUS HARRIS
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
202-639-6000
ddebruin@jenner.com
aunikowsky@jenner.com
jstrausharris@jenner.com

*Counsel for Amicus Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Amicus Curiae certifies that:

**(A) Parties and *Amicus***

Plaintiff-Appellee/Appellant United States of America ("the Government") charged Defendant-Appellant/Appellee Fokker Services B.V. ("FSBV") pursuant to a criminal Information filed on June 5, 2014 in the United States District Court for the District of Columbia. This Court has appointed David W. DeBruin of Jenner & Block LLP as Amicus Curiae to present arguments in favor of the ruling under review.

**(B) Ruling Under Review**

The ruling under review is Judge Richard J. Leon's February 5, 2015 Memorandum Opinion ("Opinion") and accompanying Order denying the parties' Joint Consent Motion for Exclusion of Time Under the Speedy Trial Act ("Order"). *United States v. Fokker Servs. B.V.*, No. 14-cr-121 (RJL), --- F. Supp. 3d ---, 2015 WL 729291 (D.D.C. Feb. 5, 2015). The Opinion and Order appear in the Joint Appendix ("J.A.") at pages 321-33 and 334, respectively.[1]

---

[1] All references to the J.A. are to the Joint Appendix filed by Plaintiff-Appellee/Appellant and Defendant-Appellant/Appellee on June 4, 2015.

i

**(C)  Related Cases**

This Court has already consolidated the appeals filed by FSBV (No. 15-3016) and the Government (No. 15-3017).  This case has not previously been before this Court.  Amicus is not aware of any other pending, related cases.

/s/ David W. DeBruin
DAVID W. DEBRUIN
ADAM G. UNIKOWSKY
JULIE STRAUS HARRIS
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
202-639-6000
ddebruin@jenner.com
aunikowsky@jenner.com
jstrausharris@jenner.com

*Counsel for Amicus Curiae*

ii

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ...................................................................................v

GLOSSARY.........................................................................................................x

JURISDICTIONAL STATEMENT ......................................................................1

STATEMENT OF THE ISSUES..........................................................................1

STATUTES AND REGULATIONS .....................................................................2

STATEMENT OF THE CASE ............................................................................2

SUMMARY OF ARGUMENT ............................................................................8

ARGUMENT .......................................................................................................11

I.    THIS COURT LACKS JURISDICTION TO HEAR THIS APPEAL.........11

      A.    The Court Lacks Jurisdiction Under The Collateral-Order
            Doctrine. ............................................................................................11

            1.    Courts View Interlocutory Appeals in Criminal Cases
                  With Great Skepticism............................................................11

            2.    The District Court's Order Fails The "Collateral Order"
                  Requirements. ........................................................................14

      B.    28 U.S.C. § 1292(a)(1) Does Not Provide a Basis for
            Jurisdiction Because the District Court's Order Did Not Refuse
            an Injunction......................................................................................21

      C.    Pendent Jurisdiction Does Not Lie.....................................................23

      D.    If the Court Dismisses the Appeal, It Should Clarify That the
            Speedy Trial Act Clock Stopped During the Appeal. ........................24

II.   UNDER 18 U.S.C. § 3161(H)(2),THE DISTRICT COURT HAD
      THE DISCRETION TO REJECT THE DPA ON THE GROUND
      THAT IT WAS TOO LENIENT.................................................................25

A. The Parties' Interpretation Is Incorrect. .............................................26

B. Correctly Construed, § 3161(h)(2) Permits A Court To Reject A DPA On The Ground That It Is Too Lenient. .....................................29

    1. Text ...............................................................................................30

    2. Structure .......................................................................................32

    3. Purpose.........................................................................................33

C. If The Court Concludes That a Judge May Not Consider a DPA's Substantive Fairness, the District Court Should Have the Opportunity to Assess the DPA's Fairness Under the Appropriate Legal Standard. ...............................................................37

III. THE DISTRICT COURT'S ORDER WAS CONSISTENT WITH SEPARATION-OF-POWERS PRINCIPLES................................................40

A. The Exercise of Judicial Discretion Expressly Conferred by Congress Is Not a Separation-of-Powers Violation. ...........................40

B. If the Government Had Wanted to Avoid Judicial Scrutiny, It Should Have Signed a Non-Prosecution Agreement Rather Than a DPA. .........................................................................................44

C. The Parties' Cases Are Readily Distinguishable. ...............................46

IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION. .............48

V. THE GOVERNMENT IS NOT ENTITLED TO A WRIT OF MANDAMUS...................................................................................................51

VI. REASSIGNMENT IS NOT WARRANTED. .................................................54

CONCLUSION ....................................................................................................59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM

iv

# TABLE OF AUTHORITIES*

**CASES**

*Abney v. United States*, 431 U.S. 651 (1977) ..........................................12

*In re al-Nashiri*, No. 14-1203, --- F.3d ----, 2015 WL 3851966 (D.C. Cir. June 23, 2015) ..........................................52

*\*Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33 (1980) ...........51, 53

*Barnhart v. Thomas*, 540 U.S. 20 (2003)........................................ 25-26

*In re Barry*, 946 F.2d 913 (D.C. Cir. 1991) ..........................................57

*Carson v. American Brands, Inc.*, 450 U.S. 79 (1981)..........................................22

*\*Cheney v. United States District Court for District of Columbia*, 542 U.S. 367 (2004)..........................................51

*Clinton v. Jones*, 520 U.S. 681 (1997) ..........................................41

*Cobell v. Kempthorne*, 455 F.3d 317 (D.C. Cir. 2006)..........................................59

*\*Coopers & Lybrand v. Livesay*, 437 U.S. 463 (1978) ..........................................15

*Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U. S. 863 (1994) ...............16

*Evans v. Williams*, 206 F.3d 1292 (D.C. Cir. 2000) .......................... 22-23

*Hastings v. Judicial Conference of U.S.*, 770 F.2d 1093 (D.C. Cir. 1985) ....... 42-43

*Helstoski v. Meanor*, 442 U.S. 500 (1979) ..........................................12

*Highmark Inc. v. Allcare Health Management System, Inc.*, 134 S. Ct. 1744 (2014)..........................................49

*I.A.M. National Pension Fund Benefit Plan A v. Cooper Industries, Inc.*, 789 F.2d 21 (D.C. Cir. 1986)..........................................21

*Khadr v. United States*, 529 F.3d 1112 (D.C. Cir. 2008) ..........................................13

---

* Authorities upon which we chiefly rely are marked with asterisks.

*Kloeckner v. Solis*, 133 S. Ct. 596 (2012) .................................................33

*Lafler v. Cooper*, 132 S. Ct. 1376 (2012) ...............................................20

*\*Liteky v. United States*, 510 U.S. 540 (1994)..........................................55

*Loughrin v. United States*, 134 S. Ct. 2384 (2014)...................................28

*\*Midland Asphalt Corp. v. United States*, 489 U.S. 794 (1989) ......................11, 19

*National Railroad Passenger Corp. v. ExpressTrak, L.L.C.*, 330 F.3d 523
   (D.C. Cir. 2003) ...................................................................23

*New York v. Dairylea Cooperative, Inc.*, 698 F.2d 567 (2d Cir. 1983)............23, 52

*Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) .......................................42

*Santobello v. New York*, 404 U.S. 257 (1971) ........................................19

*In re Sealed Case*, 716 F.3d 603 (D.C. Cir. 2013) ..................................11

*SEC v. Citigroup Global Markets, Inc.*, 752 F.3d 285 (2d Cir. 2014) .............47, 48

*\*SEC v. First City Financial Corp.*, 890 F.2d 1215 (D.C. Cir. 1989)..............58, 59

*Stack v. Boyle*, 342 U.S. 1 (1951) ...................................................12

*In re United States*, 345 F.3d 450 (7th Cir. 2003) ...........................46, 47

*United States v. Alcatel-Lucent France, SA*, 688 F.3d 1301 (11th Cir. 2012) ........17

*United States v. Approximately 81,454 Cans of Baby Formula*, 560 F.3d 638
   (7th Cir. 2009)....................................................................31

*\*United States v. Carrigan*, 778 F.2d 1454 (10th Cir. 1985) ..............13, 14, 15, 16,
   41, 51-52, 53

*United States v. Cisneros*, 169 F.3d 763 (D.C. Cir. 1999) .....................19

*United States v. Crosby*, 20 F.3d 480 (D.C. Cir. 1994).......................8, 12

*United States v. E-Gold, Ltd.*, 521 F.3d 411 (D.C. Cir. 2008), *abrogated on
   other grounds by Kaley v. United States*, 134 S. Ct. 1090 (2014) ...................22

*United States v. Ferris*, 751 F.2d 436 (1st Cir. 1984) ............................24

*United States v. Harris*, 376 F.3d 1282 (11th Cir. 2004) ........................................34

*United States v. Harris*, 679 F.3d 1179 (9th Cir. 2012) .................................... 31-32

*United States v. Jeter*, 315 F.3d 445 (5th Cir. 2002) ................................................32

*United States v. Lester*, 992 F.2d 174 (8th Cir. 1993) ............................................18

*United States v. MacDonald*, 435 U.S. 850 (1978) .................................................11

*United States v. Maddox*, 48 F.3d 555 (D.C. Cir. 1995) ...................................31, 51

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995)...............22, 47, 48

*United States v. Romero-Tamayo*, 212 F.3d 729 (2d Cir. 2000) ............................32

*United States v. Saintil*, 705 F.2d 415 (11th Cir. 1983)..........................................24

*\*United States v. Samueli*, 582 F.3d 988 (9th Cir. 2009) ............... 13, 17, 18, 21-22

*United States v. Stubblefield*, 643 F.3d 291 (D.C. Cir. 2011) ................................33

*United States v. Tyler*, 878 F.2d 753 (3d Cir. 1989)................................................24

*United States v. Woodruff*, 50 F.3d 673 (9th Cir. 1995) .........................................18

*In re Vasquez-Ramirez*, 443 F.3d 692 (9th Cir. 2006)......................................46, 47

*Zedner v. United States*, 547 U.S. 489 (2006) ..................................................36, 42

**STATUTES**

18 U.S.C. § 3161(c)(1)................................................................................5, 25

18 U.S.C. § 3161(h) .......................................................................................25

18 U.S.C. § 3161(h)(1).................................................................................33

18 U.S.C. § 3161(h)(1)(C) .......................................................................14, 24

*18 U.S.C. § 3161(h)(2) ..................................... 1, 9, 14, 25, 26, 27, 28, 29, 30, 31,
                                       32, 33, 34, 37, 38, 43, 47, 53, 54

18 U.S.C. § 3161(h)(3)..................................................................................33

18 U.S.C. § 3161(h)(4)..................................................................................33

18 U.S.C. § 3161(h)(5)..................................................................................33

18 U.S.C. § 3161(h)(6)..................................................................................33

18 U.S.C. § 3161(h)(7)(A) .....................................................................32, 36

18 U.S.C. § 3161(h)(7)(B) ............................................................................32

18 U.S.C. § 3161(h)(7)(C) ............................................................................32

18 U.S.C. § 3553(a)(6)..................................................................................57

18 U.S.C. § 3731 ...........................................................................................13

28 U.S.C. § 1291 ......................................................................................1, 11

28 U.S.C. § 1292(a) ......................................................................................20

28 U.S.C. § 1292(a)(1) ...................................................................................1

28 U.S.C. § 3231 .............................................................................................1

50 U.S.C. § 1701(a) ........................................................................................2

**LEGISLATIVE MATERIALS**

S. Rep. No. 93-1021 (1974) ....................................................................29, 35

**OTHER AUTHORITIES**

Anthony S. Barkow & Rachel E. Barkow, *Introduction*, *in Prosecutors in
    the Boardroom* (Anthony S. Barkow & Rachel E. Barkow, eds. 2011) ............54

Richard A. Epstein, *The Dangerous Incentive Structures of Nonprosecution
    and Deferred Prosecution Agreements*, Legal Memorandum No. 129
    (2014)..............................................................................................35

Fed. R. Civ. P. 23(e)......................................................................................30

Fed. R. Civ. P. 23(e)(2)..................................................................................30

Fed. R. Crim. P. 11(c)(3)(A)..........................................................................31

Benjamin M. Greenblum, *What Happens to a Prosecution Deferred? Judicial Oversight of Corporate Deferred Prosecution Agreements*, 105 Colum. L. Rev. 1863 (2005) ...............................................................................38

Erik Paulsen, *Imposing Limits on Prosecutorial Discretion in Corporate Prosecution Agreements*, 82 N.Y.U. L. Rev. 1434 (2007)...................................35

United States Department of Justice, U.S. Attorney's Manual 9-27.600 Cmt. B.2. (1997) ........................................................................................................45

# **GLOSSARY**

DPA          Deferred Prosecution Agreement

FSBV         Fokker Services B.V.

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Columbia had jurisdiction over the case below under 18 U.S.C. § 3231.  FSBV and the United States filed notices of appeal on February 18, 2015, and March 9, 2015, respectively, and the United States filed a Petition for a Writ of Mandamus on June 4, 2015.

As explained below, this Court lacks jurisdiction over the parties' interlocutory appeals.  Contrary to the parties' submissions, the District Court's order is not an appealable "collateral order" under 28 U.S.C. § 1291 and does not deny an injunction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.     Whether this Court has jurisdiction over the parties' interlocutory appeals of the District Court's Order.

2.     Whether the District Court abused its discretion by denying the parties' motion to exclude time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), which provides for the exclusion of a period of delay pursuant to a deferred prosecution agreement "with the approval of the court."

3.     Whether the District Court's comments during oral argument and in the opinion below warrant recusal.

1

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the addendum to this brief.

## STATEMENT OF THE CASE

The International Emergency Economic Powers Act grants the President the authority to "deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States . . . ."  50 U.S.C. § 1701(a).  On March 15, 1995, President Clinton exercised that authority by issuing Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat."  JA 40.  Subsequently, President Clinton issued two Executive Orders directing the Secretary of the Treasury to promulgate rules establishing sanctions against Iran.  *Id.*  Pursuant to that authority, the Secretary of the Treasury has issued regulations severely restricting sales of goods, technology, or services to Iran.  JA 40-41.  The Secretary has issued similar regulations imposing sanctions on Burma and Sudan.  JA 41-42.

Fokker Services B.V. ("FSBV") is an aerospace company which provides logistical support, maintenance, and repair services.  JA 55.  On June 5, 2014, the United States filed a criminal Information charging FSBV with conspiracy to

unlawfully export U.S.-origin goods and services to Iran, Sudan, and Burma, in violation of 18 U.S.C. § 371 (conspiracy to commit offense against the United States), 50 U.S.C. § 1705 (International Emergency Economic Powers Act), and 31 C.F.R. pt. 560 (Iranian Transactions Regulations). *See* JA 55-65. The Information alleges that FSBV made a staggering "1,153 shipments of aircraft spare, repaired, or exchanged parts" to customers in U.S.-sanctioned countries. JA 57. To facilitate this scheme, FSBV internally published a "work instruction," which detailed steps its "employees were to take to evade U.S. sanctions and avoid detection by U.S. authorities." JA 63. FSBV's president was fully aware of the company's criminal conduct, to the point of threatening to fire FSBV's in-house counsel if he attempted to stop the illegal Iranian sales. JA 64.

Attached to the Information was a Deferred Prosecution Agreement ("DPA"), which the parties signed two days before the Information was filed. JA 20-36. Exhibit A to the DPA was a Factual Statement containing further details of the egregious scope of FSBV's criminal conduct. JA 38-53. The Factual Statement establishes that FSBV knowingly and willfully sold aerospace services to customers in Iran, Sudan, and Burma, including five Iranian military entities. JA 43. The highest levels of FSBV's senior management were fully aware of U.S. sanctions provisions, yet *directed* the illegal sales to occur. JA 43-47. To avoid detection, FSBV's management used numerous schemes to hide FSBV's illegal

3

activities, ranging from falsifying paperwork to manipulating its internal databases. JA 48-49.  Through its efforts, FSBV earned $21 million in illicit revenues.  JA 39.

The Factual Statement further reports that on June 23, 2010, FSBV made an initial disclosure to the U.S. Government of "certain historic FSBV transactions that potentially implicated various U.S. regulations" and then reported further details of an internal investigation.  JA 50-51.  According to the Factual Statement, FSBV has since "taken voluntary steps to enhance and optimize its sanctions compliance program[.]"  JA 51.

In the DPA, FSBV "accept[ed] and acknowledge[d] responsibility for its conduct and that of its employees as set forth in the Factual Statement," acknowledged that its conduct was illegal, and "acknowledge[d] that at least $21,000,000 was involved in transactions described in the Factual Statement."  JA 20-21.  Further, "[i]n lieu of a criminal prosecution and related forfeiture, FSBV hereby agrees to pay to the United States the sum of $10,500,000[.]"  JA 21. FSBV also agreed to cooperate with the United States and to comply with American law, but the DPA did not require any independent monitor to ensure FSBV's compliance.  JA 25-26, JA 91.  In exchange for FSBV's acceptance of responsibility and cooperation, the United States agreed to defer prosecution of FSBV "for a period beginning on the date on which the Information is filed, and ending 18 months from that date[,]" and, "if FSBV is in full compliance with all of

4

its obligations under this Agreement . . . [to] seek dismissal with prejudice of the Information[.]" JA 22-23.

Under the Speedy Trial Act, criminal trials must typically proceed within 70 days of an indictment. 18 U.S.C. § 3161(c)(1). The time during which a DPA is pending can be excluded from this 70-day clock, but only "with the approval of the court." 18 U.S.C. § 3161(h)(2). Thus, on the same day that the Government filed its Information, the Government and FSBV filed a Joint Consent Motion for Exclusion of Time Under the Speedy Trial Act ("Motion"). JA 15-18. In the Motion, the parties asked the District Court to "find it to be in the interest of justice to exclude a period of 18 months from the computation of speedy trial calculations under . . . the Speedy Trial Act." JA 17. In support of their request, the parties stated that they had entered into a written DPA, the purpose of which was "to allow Fokker Services to demonstrate its good conduct and implement certain remedial measures." JA 15.

On June 25, 2014, the District Court held a status conference about the Motion and DPA. JA 68-78. At that time, the District Court stated that the Information alleged "extremely serious conduct especially the portions relating to Iran," which was "repeated over a protracted period of time involving the very senior most folks in the company." JA 70-71. The Court found the DPA "to be extraordinarily disproportionate to the conduct that's alleged in this Information if

5

it can be proved," and expressed "great concerns."    JA 70.  Thus, it requested additional briefing explaining "why the arrangement that's contained in here is an appropriate arrangement – 18 months, no monitor, no criminal prosecution of individuals, $10 million forfeiture when there was $21 million in profits that were supposedly attributable to this conduct here."  JA 71.

Following supplemental briefing, the District Court held a follow-up hearing on July 9, 2014.  At the hearing, the Court advised the parties that a member of the press had sent the court an article "rais[ing] some questions" about the voluntariness of FSBV's disclosure to the Government, and stated that "the Court would be . . . remiss in not following up a little bit with the Government in questions here in court with regard to some of the issues that it raised in this article."  JA 131-32.  The District Court additionally requested that the parties brief the court on "the standard of review when the Court is reviewing a Deferred Prosecution Agreement," JA 132, and scheduled a further hearing on both issues, which ultimately occurred on October 29, 2014.  JA 297-320.

At the October 29 hearing, the District Court advised the parties that it had reviewed the United States' report on its inquiry into the voluntariness of FSBV's initial disclosure and did not "quarrel with the conclusion that [the United States] reached" that the initial disclosure was voluntary.  JA 298.  The District Court stated that it had to "focus now on the bottom line basically and whether or not this

is an agreement that the Court is comfortable with and thinks is appropriate under the circumstances."   JA 299.   It reiterated that it thought the DPA "probably" constituted "too good a deal for the defendant, way too good."   JA 300.   Although the District Court told the parties that it had "not made a final decision" about whether to approve the DPA, it advised the parties "to have some discussions as to, if [the court] rejects [the DPA], is there an alternative resolution we can come up with that might be acceptable to the Court."   JA 306-07.

On February 5, 2015, the District Court issued a Memorandum Opinion and Order denying the Joint Consent Motion for Exclusion of Time.   JA 321-334.   As the Opinion notes, the parties were "requesting the Court to lend its judicial imprimatur to their DPA," under which, "this criminal case would remain on this Court's docket for the duration of the agreement's term" with the parties "retain[ing] the possibility of using the full range of the Court's powers in the future should Fokker Services fail to comply with the agreed upon terms."   JA 329-30.   The District Court found that the Government had alleged "voluminous violations" that were "knowing and willful, and were orchestrated at the highest levels of the company," and that FSBV "brought in $21 million in revenue from these illegal transactions[.]"   JA 331.   It noted further that "the DPA does not call for an independent monitor, or for any periodic reports to be made to either this Court or the Government verifying the company's compliance with U.S. law over

this very brief 18-month period." JA 331-32. Accordingly, the District Court concluded that "the DPA presented here is grossly disproportionate to the gravity of Fokker Services' conduct in a post-9/11 world." JA 332. It noted that it was not "ordering or advising the Government, or the defendant, to undertake or refrain from undertaking any particular action" but was "merely declining to approve the document before [it]." JA 333. It stated that it "remain[ed] open to considering a modified version in the future should the parties agree to different terms and present such an agreement for [the court's] approval." JA 333.

FSBV and the Government filed interlocutory appeals of the District Court's order. JA 11, 13.

## SUMMARY OF ARGUMENT

This Court lacks jurisdiction over these interlocutory appeals. The parties contend that the Court has jurisdiction under the so-called "collateral order" doctrine. But in criminal cases, the collateral order doctrine "has been interpreted 'with the utmost strictness' to permit interlocutory review of denials of only three kinds of orders: motions to reduce bail, motions to dismiss based on double jeopardy and motions to dismiss under the Speech or Debate Clause." *United States v. Crosby*, 20 F.3d 480, 487 (D.C. Cir. 1994). The order under review falls into none of those categories. Moreover, it is: non-final, because the parties can simply renegotiate their DPA; inextricably intertwined with the merits of FSBV's

appropriate sentence; and effectively reviewable by both parties following a final judgment. Parties may not file interlocutory appeals of orders rejecting plea agreements, and the result should be no different here.

FSBV contends that the Court has jurisdiction because the District Court rejected a motion for an injunction. That is incorrect. The DPA is not an injunction: it is an agreement between parties, not a court order enforceable by contempt.

If the Court reaches the merits, it should hold that the District Court had the authority to consider the substantive fairness of the DPA. Under 18 U.S.C. § 3161(h)(2), a DPA requires "approval of the court." The plain text of this provision grants a district court the discretion to consider the substantive fairness of a DPA before approving it. The parties argue that a district court may reject a DPA *only* if it concludes that the parties are using the DPA as a pretext for a continuance, but that artificial restriction on judges' discretion finds no basis in § 3161(h)(2). The legislative history, structure, and purpose of the Speedy Trial Act similarly confirm a district court's discretion to consider a DPA's substantive fairness.

Contrary to the parties' contentions, the District Court's rejection of the DPA poses no separation-of-powers problem. The District Court's order does not force the Government to pursue a criminal prosecution. The Government remains

free to negotiate a new DPA, try its case, or dismiss the charges. Prosecutorial discretion does not confer upon the Government the right to force a judge to exclude time from the Speedy Trial Act clock for 18 months. A district court order excluding time under the Speedy Trial Act is a judicial act, and separation-of-powers principles give a judge the authority and the obligation to exercise independent judgment in performing that judicial act. If the Government had wanted to avoid judicial involvement, it should have signed a non-prosecution agreement; by instead choosing to invoke judicial process and filing a motion to exclude time under the Speedy Trial Act, it cannot now characterize the District Court's denial of that motion as a separation-of-powers violation.

On the merits, the District Court did not abuse its discretion in rejecting the DPA. FSBV willfully violated the U.S. sanctions regime over 1,000 times and repeatedly provided assistance to the Iranian military. Yet under the DPA, as long as it agreed to pay back the revenues it earned and promised not to break the law, it would get off scot-free. The District Court's conclusion that the DPA was grossly disproportionate to FSBV's conduct was entirely reasonable.

The Court should deny the Government's petition for writ of mandamus. The Government can obtain effective relief after final judgment, and cannot show that the District Court's exercise of discretion was a "clear and indisputable" error.

If the Court exercises jurisdiction over this appeal, it should deny FSBV's request for reassignment to a new judge on remand. The District Court's observations concerning the gravity of FSBV's crimes were accurate characterizations of the record, and do not remotely show the type of "bias" warranting judicial recusal.

## ARGUMENT

## I.    THIS COURT LACKS JURISDICTION TO HEAR THIS APPEAL.

### A. The Court Lacks Jurisdiction Under The Collateral-Order Doctrine.

Under 28 U.S.C. § 1291, appellate courts have jurisdiction over "final decisions." *In re Sealed Case*, 716 F.3d 603, 605 (D.C. Cir. 2013). In criminal cases, § 1291 ordinarily "prohibits appellate review until after conviction and imposition of sentence." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798 (1989). Here, that has not occurred. The parties nonetheless contend that this Court has jurisdiction over their appeals under the so-called "collateral order doctrine." *Id.* As explained below, that argument fails.

    1.    *Courts View Interlocutory Appeals in Criminal Cases With Great Skepticism.*

The rule prohibiting appellate review until final judgment "has particular force in criminal prosecutions because encouragement of delay is fatal to the vindication of the criminal law." *United States v. MacDonald*, 435 U.S. 850, 835-54 (1978) (quotation marks omitted). As such, in criminal cases, the collateral-

order doctrine "has been interpreted 'with the utmost strictness' to permit interlocutory review of denials of only three kinds of orders: motions to reduce bail, motions to dismiss based on double jeopardy and motions to dismiss under the Speech or Debate Clause." *Crosby*, 20 F.3d at 487. Supreme Court decisions permitting such interlocutory appeals were released in 1951, 1977, and 1979 respectively;[2] the parties do not point to a single decision from this Court during that 36-year stretch authorizing a new type of interlocutory appeal in a criminal case.

Meanwhile, during that stretch, this and other courts have routinely dismissed interlocutory appeals filed by criminal defendants pursuing closely similar arguments as FSBV. In *Crosby*, for instance, a criminal defendant filed an interlocutory appeal attempting to halt a criminal prosecution on the ground that it violated his prior plea agreement. 20 F.3d at 487. The defendant, like FSBV here, had signed an agreement with the Government that, in his view, made him immune from being tried. Yet this Court rejected this argument out of hand, holding that "[b]ecause Crosby's plea agreement violation claim does not fall within any of these three categories, we conclude that we are without jurisdiction to review that part of his motion." *Id.* Other courts have similarly dismissed interlocutory

---

[2] *Stack v. Boyle*, 342 U.S. 1 (1951) (bail); *Abney v. United States*, 431 U.S. 651 (1977) (double jeopardy); *Helstoski v. Meanor*, 442 U.S. 500 (1979) (speech or debate).

appeals in the closely related context of orders rejecting plea agreements. *United States v. Samueli*, 582 F.3d 988, 991 (9th Cir. 2009); *United States v. Carrigan*, 778 F.2d 1454, 1465 (10th Cir. 1985); *see also Khadr v. United States*, 529 F.3d 1112, 1117-18 (D.C. Cir. 2008) (collecting authority prohibiting interlocutory appeals in criminal cases).

As the above shows, the legal backdrop for criminal defendants filing interlocutory appeals is bleak. The legal backdrop for *Government* appeals in criminal cases under the collateral-order doctrine is even bleaker. Under 18 U.S.C. § 3731, the Government has the statutory right to file interlocutory appeals in criminal cases of certain types of district court orders. But denials of motions to exclude time under the Speedy Trial Act are not among them, which is why the Government must resort to the collateral-order doctrine.

To Amicus's knowledge, this Court has *never* heard a Government collateral-order appeal in a criminal case. The Government identifies two out-of-circuit cases hearing such appeals, but in both cases the orders under review were completely unrelated to the criminal case: one was an order concerning treatment of pretrial detainees, and the other was an order addressing a discovery dispute with civil plaintiffs in another case. Gov't Br. 51-52. In the more similar context of a Government appeal of a plea-agreement rejection order, the Tenth Circuit has held that the collateral-order doctrine does not apply. *Carrigan*, 778 F.2d at 1465-

13

66.   Amicus has identified no case *ever* that has permitted a Government an interlocutory appeal under the collateral-order doctrine when the order under review was related to the anticipated trial.

It would be particularly perverse to recognize a non-statutory right to interlocutory appeals of rejections of DPAs under 18 U.S.C. § 3161(h)(2). According to the Government, the purpose of the judicial-approval requirement under § 3161(h)(2) is to ensure that parties do not sign DPAs to "evade Speedy Trial Act time limitations."  Gov't Br. 40.  Yet the Government's position would permit precisely that evasion.  Under the Government's position, if a district court rejects a DPA under § 3161(h)(2),  it would then have the right to an interlocutory appeal – which would itself stop the Speedy Trial Act Clock.   18 U.S.C. § 3161(h)(1)(C).  District courts' right to ensure that cases proceed to trial swiftly would be completely subverted if parties could file interlocutory appeals of orders requiring swift trials.

> 2.     *The District Court's Order Fails The "Collateral Order" Requirements.*

Given the historical reluctance of courts to hear interlocutory criminal appeals, and the perverse consequences of exercising interlocutory jurisdiction in the Speedy Trial Act context, the Court should hold that it lacks appellate jurisdiction under the collateral-order doctrine.

14

To fall within the collateral-order doctrine, an interlocutory order must meet three requirements: (1) it must "conclusively determine the disputed question"; (2) it must "resolve an important issue completely separate from the merits of the action"; and (3) it must "be effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978). The District Court's interlocutory order here meets none of those requirements.

*1.* "*Conclusively determine the disputed question*." The District Court's order is not "conclusive." The District Court did *not* prohibit the parties from entering into a DPA. Rather, it expressly stated that it would consider a "modified version" of the DPA; it simply rejected "the document before [it]." JA 333. Thus, the question of whether the parties will sign a DPA remains in flux. *Carrigan*, 778 F.2d at 1465 (plea-rejection order was non-final because "the prosecutor and defendant may renegotiate an agreement that the district court will accept").

The parties contend that the District Court's order is "conclusive" because it establishes the District Court's refusal to accept *this particular* DPA. But this narrow interpretation of the "conclusiveness" requirement ignores the purpose of that requirement, which is to prevent piecemeal appeals. Here, the potential for piecemeal appeals is clear. If this Court holds that the District Court did not abuse its discretion in rejecting this DPA, then the parties might negotiate a new DPA. If the District Court rejects that one too, the parties may file yet another appeal.

15

Alternatively, if this Court finds the District Court's reasoning unpersuasive and remands for additional explanation, the District Court might reach the same conclusion on remand, precipitating another appeal. Thus, allowing an interlocutory appeal would "frustrate the policy against piecemeal disposition of criminal proceedings." *Carrigan*, 778 F.2d at 1466.

The parties might argue that these outcomes will not occur, because in their view, district courts are legally obligated to accept DPAs, no questions asked. But this argument is premised on the parties' prediction that the District Court's decision will be reversed, and the Court's decision on appellate jurisdiction should not depend on the appeal's outcome on the merits. Moreover, even the parties admit that a district court is permitted to reject a DPA if the court finds that the Government had an improper purpose. Gov't Br. 40-41, 43; FSBV Br. 46-47. In a future case, if a district court rejects a DPA on that ground, the possibility of piecemeal appeals is manifest. *See Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994) (court must consider "entire category to which a claim belongs" in deciding whether to accept jurisdiction under collateral-order doctrine).

2. *Resolve an important issue completely separate from the merits of the action.* There is clear overlap between the District Court's decision and the "merits of the action." The District Court rejected the DPA because it found that

16

FSBV's conduct was egregious and warranted significant punishment. At sentencing, the District Court will again consider whether FSBV's conduct was egregious and warrants significant punishment. FSBV now argues that its voluntary self-disclosure justifies a lenient DPA (FSBV Br. 37); if it is convicted and sentenced, FSBV doubtless will argue that its voluntary self-disclosure justifies a lenient sentence. Therefore, there is a close connection between the arguments in this appeal and the merits of the case. *Samueli*, 582 F.3d at 992 ("[T]he decision to reject a plea is directly dependent on the court's assessment of the defendant's degree of culpability and cannot be separated from the principal issue as required by the collateral-order doctrine" (internal quotation marks omitted)); *United States v. Alcatel-Lucent France, SA*, 688 F.3d 1301, 1304-05 & n.1 (11th Cir. 2012) (no appellate jurisdiction over third party's appeal of restitutionary provisions in DPA because "the issue of restitution is part and parcel of the criminal sentence that may or may not ultimately be imposed").

To be sure, *some* issues in this appeal are collateral from the merits, but merely showing *some* difference between the interlocutory order and the merits is insufficient to satisfy the collateral-order doctrine; the parties must show that the interlocutory order is "*completely separate*" from the merits. They cannot meet that burden.

*3. Unreviewable on appeal from any final judgment.* Both parties could obtain review of the District Court's order after final judgment. The Government can let the Speedy Trial Act clock run out, and appeal from the dismissal on the ground that time should have been excluded under the Speedy Trial Act. The Government complains that if it does this, it bears the risk of having "no ability to refile the charges *absent successful appeal of the dismissal.*" Gov't Br. 53. It should go without saying that bearing the risk of *losing* on appeal does not make an order "unreviewable."[3]   FSBV, for its part, can appeal from a judgment of conviction and argue that the District Court should have accepted the DPA. If its appeal is successful, the appellate court can vacate the conviction and direct the District Court to accept the DPA on remand. *Cf. Samueli*, 582 F.3d at 992-93 (plea-rejection order is reviewable after final judgment).

FSBV contends that the "legal and practical value" of its right to a DPA "would be destroyed if it were not vindicated before trial," because the purpose of

---

[3] The Government argues that the District Court might dismiss the case without prejudice, and that this Court might hold that such a dismissal is interlocutory in character and thus non-appealable. Gov't Br. 53. It cites a Seventh Circuit panel decision so holding, which has been vacated by the en banc court. *Id.* (citing *United States v. Davis*, 766 F.3d 722 (7th Cir. 2014)). Two other circuits have held that without-prejudice dismissals *are* appealable, *United States v. Woodruff*, 50 F.3d 673, 674-75 (9th Cir. 1995); *United States v. Lester*, 992 F.2d 174, 176 (8th Cir. 1993), and no surviving authority supports the *Davis* panel opinion. In any event, if *Davis* is correct and a without-prejudice *dismissal* under the Speedy Trial Act is unappealable, then *a fortiori*, a mere *denial of exclusion of time* should be unappealable too.

the DPA is to avoid a trial. FSBV Br. 27 (quoting *Midland Asphalt*, 489 U.S. at 799). But this is not a case in which FSBV asserts a "right not to be tried," which the Supreme Court has defined as a right which "rests upon an explicit statutory or constitutional guarantee that trial will not occur – as in the Double Jeopardy Clause . . . or the Speech or Debate Clause." *Midland*, 489 U.S. at 801. FSBV vaguely asserts that its arguments are "grounded in due process," FSBV Br. 28, but it makes no coherent argument about how the District Court's refusal to accept the DPA could possibly violate the Due Process Clause. *Cf. Santobello v. New York*, 404 U.S. 257, 262 (1971) (defendants have "no absolute right to have a guilty plea accepted"). In any event, the mere assertion of a constitutional argument, even one premised on the separation of powers, does not entitle a criminal defendant to an interlocutory appeal. *United States v. Cisneros*, 169 F.3d 763, 768-69 (D.C. Cir. 1999).

FSBV also complains that the DPA has an 18-month expiry date, so waiting until final judgment might render the DPA moot. This argument fails for several reasons. First, the length and terms of the DPA are entirely within the *parties'* control; they should not be permitted to jerry-rig the DPA to create an artificial necessity for interlocutory review.

Second, in the ordinary case, interlocutory appeals would not solve any mootness problems. Under the Speedy Trial Act, trials ordinarily must start within

70 days of the indictment. Thus, waiting until final judgment would typically delay disposition of the appeal by a few months at most, which would affect mootness only in atypical cases.

Third, even if the 18-month period expires before an appeal of a final judgment is resolved, FSBV could still obtain relief. The District Court could enter an order accepting the DPA *nunc pro tunc*, and dismissing the Information if FSBV complied with it during the appeal.

There may be some class of DPAs which are time-sensitive and cannot be reinstated, but the possibility of such DPAs does not justify an interlocutory appeal. Notably, many plea agreements are time-sensitive – for instance, they may require the defendant to testify at an already-scheduled trial – yet interlocutory review of plea-agreement rejections is prohibited. In the plea-agreement context, when the passage of time makes it unfeasible to restore the terms of a plea bargain following final judgment, a district court has broad remedial discretion to craft appropriate equitable relief. *Cf. Lafler v. Cooper*, 132 S. Ct. 1376, 1389 (2012). A district court can similarly craft equitable relief in the rare cases where it rejects a time-sensitive DPA and is later reversed. The existence of such rare cases does not justify creating a blanket new exception to the final judgment rule.

**B. 28 U.S.C. § 1292(a)(1) Does Not Provide a Basis for Jurisdiction Because the District Court's Order Did Not Refuse an Injunction.**

FSBV argues that this Court has jurisdiction under 28 U.S.C. § 1292(a) because the DPA is an injunction, and appellate courts have jurisdiction over orders refusing injunctions. This argument is a non-starter, because the DPA is not an injunction.

An injunction is an "order directed to a party, enforceable by contempt, and designed to accord or protect, some or all of the substantive relief sought by a complaint in more than preliminary fashion" constitutes an injunction. *I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.*, 789 F.2d 21, 24 (D.C. Cir. 1986) (quotation marks omitted). The DPA is not an order "enforceable by contempt." It is not a court order at all. It is an agreement between the Government and FSBV. As FSBV concedes, should FSBV commit a "willful and material breach of any provision of" the DPA, the agreement is "enforceable by the United States reinitiating its criminal prosecution of the charges already filed against FSBV." FSBV Br. 22. Thus, breaching the DPA does not trigger any punishment from the court for violating a court order; it triggers the initiation of criminal prosecution by the Government addressing unrelated conduct. The sole court order in this case was an order declining to exclude time under the Speedy Trial Act, which obviously is not the refusal of an "injunction." *Cf. Samueli*, 582

21

F.3d at 993-94 (plea-rejection order is not an injunction because it "does not place the parties under court order of any kind" and "is not enforceable by contempt").

FSBV argues that the DPA mandates payments and future conduct. FSBV Br. 21-24. But if this were enough to make a DPA an "injunction," then *all* contracts would be injunctions. And the mere fact that breaching a DPA yields a criminal prosecution does not make it an injunction – if that were true, then *non-prosecution agreements*, which carry identical consequences when breached, would be injunctions as well. That cannot be right, given that non-prosecution agreements involve no judicial proceedings.

The case law cited by FSBV uniformly addresses injunctions: court orders enforceable by contempt. In *United States v. E-Gold, Ltd.*, 521 F.3d 411, 415 (D.C. Cir. 2008), *abrogated on other grounds by Kaley v. United States*, 134 S. Ct. 1090 (2014), this Court permitted interlocutory review of a court-issued seizure warrant and restraining order, pointing out that "defendants would . . . at the very least, have been penalized by contempt had they failed to comply." In *Carson v. American Brands, Inc.*, 450 U.S. 79, 86 (1981), and *United States v. Microsoft Corp.*, 56 F.3d 1448, 1456 (D.C. Cir. 1995), the courts permitted appellate review of the denial of *consent decrees*. A consent decree is a type of injunction: if a party violates the consent decree, it faces contempt sanctions. *See, e.g.*, *Evans v.*

22

*Williams*, 206 F.3d 1292, 1293-94 (D.C. Cir. 2000).  By contrast, FSBV faces no risk of contempt sanctions if it violates the DPA.

For completeness, Amicus also disagrees with FSBV's contention that the District Court's order will have "irreparable consequences" (FSBV Br. 24-26); as described above, FSBV is fully able to obtain appellate review following a final judgment.  *Supra*, at 18; *see also New York v. Dairylea Coop., Inc.*, 698 F.2d 567, 570 (2d Cir. 1983) (holding that parties could not show "irreparable harm" when district court rejected consent decree directing defendant to make money payments and ordering it to follow the law and "explicitly expresse[d] a willingness to consider" alternative proposals).  But that point is academic, given that FSBV's argument fails on the more basic ground that the DPA is not an injunction at all.

### C. Pendent Jurisdiction Does Not Lie.

Finally, FSBV argues that "this Court may exercise pendent jurisdiction over FSBV's appeal if it exercises appellate jurisdiction over the United States' interlocutory appeal."  FSBV Br. 30-31.  That doctrine is irrelevant, however, where the same order is the subject of both appeals.  Rather, "[a] court exercises pendent jurisdiction when, while reviewing an order over which it has appellate jurisdiction, it entertains an appeal from *another order* that, although part of the same case or controversy, would not otherwise be within its jurisdiction."  *Nat'l R.R. Passenger Corp. v. ExpressTrak, L.L.C.*, 330 F.3d 523, 527 (D.C. Cir. 2003)

(emphasis added). If this Court exercises jurisdiction over the Government's interlocutory appeal, "pendent jurisdiction" over FSBV's appeal is unnecessary; if it denies jurisdiction over the Government's interlocutory appeal, FSBV's argument is moot.

### D. If the Court Dismisses the Appeal, It Should Clarify That the Speedy Trial Act Clock Stopped During the Appeal.

Under the Speedy Trial Act, an interlocutory appeal stops the Speedy Trial Act clock. 18 U.S.C. § 3161(h)(1)(C). But if this Court dismisses the appeal for lack of jurisdiction, FSBV might argue on remand that the Speedy Trial Act clock never stopped, because the parties were not entitled to take an appeal in the first place. Thus, FSBV might argue that the 70-day clock ran down while this appeal was pending, and that the Information should be dismissed.

The Court should foreclose this outcome by clarifying that even if it lacks jurisdiction, the Speedy Trial Act clock was still stopped while the appeal was pending. Two circuits have held that an interlocutory appeal stops the Speedy Trial Act clock, even if it is later dismissed. *United States v. Ferris*, 751 F.2d 436, 440-41 (1st Cir. 1984); *United States v. Saintil*, 705 F.2d 415, 417-19 (11th Cir. 1983). Another circuit has held that the Speedy Trial Act clock steps where, as here, there is a pending petition for a writ of mandamus. *United States v. Tyler*, 878 F.2d 753, 758 n.2 (3d Cir. 1989). The Court should follow that authority and

24

hold that the Speedy Trial Act clock will not restart until the Court issues its mandate.

## II.  UNDER 18 U.S.C. § 3161(H)(2),THE DISTRICT COURT HAD THE DISCRETION TO REJECT THE DPA ON THE GROUND THAT IT WAS TOO LENIENT.

If the Court exercises jurisdiction, it should affirm the District Court's refusal to approve the DPA.

The Speedy Trial Act requires a trial to commence within seventy days of the later of the filing of an indictment or the defendant's first appearance in court, but directs courts to "exclude" certain delays in computing whether seventy days have passed.  18 U.S.C. § 3161(c)(1), (h).  Pertinent here is the following exclusion provision:

> Any period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct.

18 U.S.C. § 3161(h)(2).

It is undisputed that under this provision, if the parties enter into a DPA, judicial approval is required for time to be excluded under the Speedy Trial Act. The parties contend, however, that a judge's authority to reject a DPA is extremely narrow.  According to the parties, a court may reject a DPA *only* if it was not "for the purpose of allowing the defendant to demonstrate his good conduct," and is

25

barred from considering the substantive fairness of the DPA.  Gov't Br. 40-43; FSBV Br. 32-35.

As explained below, that interpretation is incorrect.  Correctly construed, § 3161(h)(2) grants district courts the discretion to consider a DPA's substantive fairness.

## A. The Parties' Interpretation Is Incorrect.

The parties contend that when deciding whether to exclude time under § 3161(h)(2), a district court's sole permissible consideration is whether the Government deferred prosecution "for the purpose of allowing the defendant to demonstrate his good conduct."  Their theory is that the phrase "with the approval of the court" modifies the *subsequent* phrase, "for the purpose of allowing the defendant to demonstrate his good conduct," such that the court's "approval" authority is limited to a determination that the Government had the "purpose of allowing the defendant to demonstrate his good conduct."  Gov't Br. 40-41, 46; FSBV Br. 32-35.

Their interpretation is wrong.  As a matter of English grammar, the phrase "with the approval of the court" modifies the *previous* phrase: "prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant."  *See, e.g.*, *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (explaining grammatical rule that a phrase "should ordinarily be read as modifying only the

noun or phrase that it immediately follows"). Thus, the judicial-approval requirement requires the court to approve the *agreement*, not the Government's purpose in signing the agreement. Accordingly, § 3161(h)(2) states that if the Government agrees to defer the defendant's prosecution for the purpose of allowing the defendant to demonstrate his good conduct, *and* the agreement obtains "the approval of the court," *then* the resultant period of delay is excluded. Critically, the judicial-approval requirement is an independent requirement which the Government cannot satisfy merely by showing that it acted "for the purposes of allowing the defendant to demonstrate his good conduct."

A simple example establishes the point. Consider the following statement: "I can take the car, with my parents' approval, for purposes of picking up groceries." A person making that statement is not saying that his parents' discretion is *solely* limited to determining whether his subjective purpose is to pick up groceries. Rather, he means that he is allowed to take the car in order to pick up groceries, as long as his parents also approve. Section 3161(h)(2) is no different: time is excluded if the Government defers prosecution in order to allow a defendant to demonstrate good behavior, as long as the court also approves.

Moreover, the parties' interpretation of § 3161(h)(2) renders the phrase "with the approval of the court" superfluous. Suppose § 3161(h)(2) had omitted the words "with the approval of the court" and simply said "Any period of delay

27

during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant for the purpose of allowing the defendant to demonstrate his good conduct." Under that alternative, the court would *still* have been required to determine whether the agreement was "for the purpose of allowing the defendant to demonstrate his good conduct" in order to decide whether § 3161(h)(2) was triggered at all. Accordingly, under the parties' interpretation, the additional phrase "with the approval of the court" is meaningless, violating the canon that statutes should be construed to avoid superfluity. *See, e.g.*, *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014). Indeed, Congress's decision to require *both* that prosecution be deferred "for the purpose of allowing the defendant to demonstrate his good conduct" *and* that the DPA obtain "approval of the court" is powerful evidence that it did *not* want the "approval of the court" to be solely linked to the Court's assessment of the Government's purpose.

The Government offers one other textual argument. It argues that it can simply evade the judicial-approval requirement of § 3161(h)(2) altogether by filing a criminal Information without an in-court appearance that would start the Speedy Trial Act clock, which is apparently permissible "in many districts." Gov't Br. 42-43. Therefore, it argues, the Court may as well ignore the judicial-approval requirement even when the clock *does* start. *Id.* This unattractive argument should

28

be rejected.  The solution to the Government's evasion of the Speedy Trial Act is to prevent this evasion by requiring an in-court appearance, not to wipe out the statutory judicial-approval requirement.

The legislative history of § 3161(h)(2) confirms what is plain from the text: a District Court's discretion to reject a DPA extends beyond an analysis of the Government's purpose.  The Senate Report states that the phrase "with the approval of the court" was intended to "assure[] that the court will be involved in the decision to divert *and* that the procedure will not be used . . . to avoid the speedy trial time limits."  S. Rep. No. 93-1021, at 37 (1974) (emphasis added).  This passage confirms what the statutory text makes clear: judges should be "involved" in DPAs *in addition* to assessing the Government's purpose.

Moreover, the legislative history also points out that Congress considered – and rejected – a draft of the provision that does not require judicial approval.  *Id.* (noting comparison to prior draft lacking judicial-approval requirement).  The parties' proposed interpretation would adopt a version of the statute that Congress expressly rejected.

## B. Correctly Construed, § 3161(h)(2) Permits A Court To Reject A DPA On The Ground That It Is Too Lenient.

The foregoing analysis demonstrates that in deciding whether to approve a DPA, a judge's discretion is not constrained to a mere determination of whether the parties acted "for the purpose of allowing the defendant to demonstrate his

29

good conduct." The next question is: in deciding whether to approve a DPA, may a court consider the DPA's substantive fairness? The text, structure, and purpose of § 3161(h)(2) establish that the answer is "yes."

### 1.  Text

The plain text of § 3161(h)(2) authorizes a court to consider a DPA's substantive fairness. Under that provision, a DPA requires "approval of the court." The word "approval" ordinarily denotes substantive endorsement, going beyond mere acceptance: compare "I *approve* the marriage" to "I *accept* the marriage." And a court cannot *endorse* an agreement which it believes to be substantively unconscionable.

Indeed, in other contexts in which a court is directed to "approve" an agreement, the court is charged with determining whether it is substantively fair. For instance, Federal Rule of Civil Procedure 23(e) requires "the court's *approval*" of a class action settlement. Such "approval" demands an independent judicial determination of whether "it is fair, reasonable, and adequate." *See* Rule 23(e)(2). Similarly, the word "approval" in § 3161(h)(2) is naturally construed to permit, if not require, a court's consideration of a DPA's substantive fairness.

Even if the statutory term "approval" was construed to mean "acceptance," as opposed to "endorsement," a district court would still be authorized to consider the DPA's substantive fairness. The critical point is that § 3161(h)(2) does not

enumerate any specific criteria a court must consider in deciding whether to approve a DPA.  As such, the decision lies within a district court's sound discretion.  *See, e.g.*, *United States v. Approximately 81,454 Cans of Baby Formula*, 560 F.3d 638, 641 (7th Cir. 2009) ("Without prescribed criteria, the judge can range widely in deciding what factors to consider, and what weight to give them, in making his ruling.  He has, in other words, considerable discretion, which implies a deferential standard of appellate review.").  Given that § 3161(h)(2) imposes no limits on a court's discretion, the parties have no basis for their proposed categorical restriction on a court's consideration of a DPA's substantive fairness.

Federal Rule of Criminal Procedure 11(c)(3)(A) is closely on point.  That provision authorizes a court to "accept" or "reject" a plea agreement, but specifies no criteria governing the court's decision.  Thus, this Court has construed that rule to give a district court broad discretion to reject a plea agreement, so long as it provides a "reasoned exercise of discretion" and is not "arbitrary."  *United States v. Maddox*, 48 F.3d 555, 558 (D.C. Cir. 1995).  And a court is perfectly entitled to exercise its discretion to reject a plea agreement on the ground that it is too lenient.  *See, e.g.*, *United States v. Harris*, 679 F.3d 1179, 1182 (9th Cir. 2012) ("[A] district court properly exercises its discretion when it rejects a plea agreement calling for a sentence the court believes is too lenient or otherwise not in the public

31

interest . . . ." (quotation marks omitted) (bracket in original)); *United States v. Jeter*, 315 F.3d 445, 448 (5th Cir. 2002) (same); *United States v. Romero-Tamayo*, 212 F.3d 729, 733-34 (2d Cir. 2000) (same).  There is no basis in § 3161(h)(2) to impose a narrower scope on a court's discretionary authority.

　　2.　　*Structure*

The Speedy Trial Act's structure confirms that a District Court has the discretion to consider the substantive fairness of a DPA.  The Speedy Trial Act includes a separate provision authorizing a judge to grant a continuance and exclude time only "on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."  18 U.S.C. § 3161(h)(7)(A).  It then enumerates the four factors "a judge shall consider in determining whether to grant a continuance," and bars a court from granting a continuance "because of general congestion of the court's calendar, or lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government."  *Id.* § 3161(h)(7)(B), (C).  As this provision shows, Congress knew how to narrow the scope of a district court's discretion in excluding time under the Speedy Trial Act.  Yet Congress included no analogous provision in § 3161(h)(2) limiting a district court's discretion.  There is therefore no basis for artificially narrowing the District Court's discretion, as the parties propose.

32

Moreover, five other delay provisions in the Speedy Trial Act do *not* include any requirement of "approval of the court."  *See* § 3161(h)(1), (3), (4), (5), and (6). Thus, under those provisions, if a court determines that the statutory requirements for exclusion of time are satisfied, exclusion occurs automatically.  *See United States v. Stubblefield*, 643 F.3d 291, 294-95 (D.C. Cir. 2011).  The parties' position is that § 3161(h)(2) should also be an automatic-delay provision: in their view, if the statutory predicate that the agreement was "for the purpose of allowing the defendant to demonstrate his good conduct" is satisfied, exclusion should occur automatically, with no further judicial discretion.  But Congress included the separate requirement of "approval of the court" in § 3161(h)(2), which it declined to include in the other subsections.  This is powerful evidence that courts should play a substantive role in approving DPAs, rather than simply rubber-stamping them.

### 3.    *Purpose*

The text of § 3161(h)(2) so clearly forecloses the parties' interpretation that the Court need not consider Congress's intent in enacting that provision. *Kloeckner v. Solis*, 133 S. Ct. 596, 607 n.4 (2012) ("[E]ven the most formidable argument concerning the statute's purposes could not overcome the clarity [of] the statute's text.").  In any event, however, construing § 3161(h)(2) to permit courts' consideration of a DPA's fairness is entirely consistent with congressional intent.

33

First, it is hard to see what *else* Congress could have intended by its judicial-approval requirement.  The parties insist that Congress's sole intent in enacting § 3161(h)(2) was to prevent the Government from using a DPA as a pretext to push off a looming trial date.  Gov't Br. 40-41; FSBV Br. 34.  But that theory makes little sense, because the Government *cannot* use a DPA to push off a trial date.  Once the Government signs a DPA, it is binding; if the defendant complies with it, the charges must be dismissed.  *See, e.g.*, *United States v. Harris*, 376 F.3d 1282, 1287-88 (11th Cir. 2004).  It would thus be unusual for a prosecutor to use a DPA to push off a trial date, and unlikely that Congress would have been solely trying to solve this unusual problem.  Moreover, as explained above, Congress included a judicial-approval requirement over and above the separate provision requiring consideration of the Government's purpose, showing that Congress intended the judicial-approval requirement to serve an additional function. *Supra* at 29.

The most natural additional function of judicial review is to assess whether the DPA is substantively fair.  Determinations of whether a criminal defendant has been punished fairly are a district court's bread-and-butter.  A district court makes this determination every time it accepts a "sentence bargain" plea or imposes a sentence.  Congress was well aware of courts' bedrock role in supervising the fair disposition of criminal cases, and naturally would have wanted judges to serve that

34

role in approving DPAs, just as they do in accepting "sentence bargain" plea agreements.

Indeed, the Speedy Trial Act's legislative history reveals Congress's understanding that DPAs be used in cases involving relatively sympathetic criminal defendants, such as "first offenders" or defendants whose "criminality is related to a specific social problem such as prostitution or heroin addiction." S. Rep. 93-1021, at 36-37. Judicial policing of DPAs for excessive lenience would ensure that DPAs are used in such sympathetic cases, as Congress intended. Conversely, recent commentary on DPAs has argued that they can include unfair or abusive provisions. *See, e.g.*, Richard A. Epstein, *The Dangerous Incentive Structures of Nonprosecution and Deferred Prosecution Agreements*, Legal Memorandum No. 129 (2014) (detailing abusive penalties contained in DPAs secured by the Government); Erik Paulsen, *Imposing Limits on Prosecutorial Discretion in Corporate Prosecution Agreements*, 82 N.Y.U. L. Rev. 1434, 1455-62 (2007) (detailing effect of unequal bargaining position and Government overreaching on abusive quality of DPAs). Judicial monitoring of a DPA's substantive fairness provides an important check on prosecutorial power.

Moreover, Congress surely recognized that when a court approves a DPA and excludes time under the Speedy Trial Act, it "lend[s] its judicial imprimatur to th[e] DPA." JA 330. Judicial approval of a DPA will inevitably be perceived

35

publicly as reflecting the court's agreement that the DPA is fair.  And if the court later enforces the DPA, and dismisses the Information, this public perception will be reinforced.  Reality should match perception: a court should not create the *perception* that it believes a DPA is fair unless it determines that the DPA *is* fair.

Judicial review of a DPA's fairness is also consonant with the Speedy Trial Act's purpose of ensuring speedy disposition of criminal cases.  The premise of the Speedy Trial Act is that criminal cases should, when possible, proceed swiftly.  *See Zedner v. United States*, 547 U.S. 489, 501-02 (2006).  And the district court has an *independent* role in ensuring that cases proceed swiftly; it cannot delay a trial merely because the parties ask it to.  "[T]he Act was designed with the public interest firmly in mind," and even when both "the prosecution" and "the defense . . . would . . . be happy to opt out," the district court carries the independent obligation to enforce the Speedy Trial Act so as to protect that public interest.  *Id.* at 502.  For instance, before granting a continuance, the Court must make on-the-record findings that the continuance is in the public interest.  § 3161(h)(7)(A).

When parties enter into a DPA, cases will typically linger on judicial dockets much longer than the 70-day time limit; here, the DPA was to last 18 months. Given the Speedy Trial Act's premise that cases should not linger on judicial dockets without a strong public-interest justification, it is entirely unsurprising that Congress would have wanted a court to independently consider the public interest

36

before agreeing to exclude time under § 3161(h)(2). And, as the District Court pointed out, grossly disproportionate DPAs are *not* in the public interest – they minimize the seriousness of the offense and provide insufficient deterrence. JA 332-33. Thus, consideration of a DPA's substantive fairness falls squarely within the Speedy Trial Act's goal of ensuring that judges consider the public interest before excluding time.

Of course, ensuring consideration of a DPA's substantive fairness may not have been Congress's *sole* purpose in enacting the judicial-approval requirement in § 3161(h)(2); some legislators might have had other purposes, or might have lacked any specific purpose at all. But the available evidence shows that this was *a* purpose Congress had in mind, which reinforces what the text makes clear: a district court has broad discretion to consider a DPA's substantive fairness.

## C. If The Court Concludes That a Judge May Not Consider a DPA's Substantive Fairness, the District Court Should Have the Opportunity to Assess the DPA's Fairness Under the Appropriate Legal Standard.

Even if this Court holds that the District Court erred in considering the DPA's substantive fairness, it should *not* issue an order directing the District Court to approve the DPA. Rather, it should remand the case for the District Court to exercise its discretion anew under the substantive standard this Court announces.

Significantly, even under the narrow interpretation of § 3161(h)(2) endorsed by the parties, this DPA might still be rejected on remand. The parties contend that

37

under § 3161(h)(2), a District Court should assess whether the Government's purpose was to "allow[] the defendant to demonstrate his good conduct."  Here, as the District Court pointed out, the DPA does not "call for an independent monitor, or for any periodic reports to be made to either this Court or the Government verifying the company's compliance with U.S. law over this very brief 18-month period," JA 332, even though "ongoing monitoring . . . has become a staple of the corporate deferral agreement."  Benjamin M. Greenblum, *What Happens to a Prosecution Deferred? Judicial Oversight of Corporate Deferred Prosecution Agreements*, 105 Colum. L. Rev. 1863, 1897 (2005).  Thus, the Government is relying on FSBV's promises that it is obeying the law – even though FSBV *did not even discharge the employees responsible for the fraud.*  JA 331-32.  This casts serious doubt on whether the Government actually cares about FSBV's good conduct.

More likely, the Government's *actual* reason for deferring prosecution was that it was not ready to try the case based on the evidence in its possession. Indeed, the Government openly admits in its brief that it offered the DPA "given the difficulty of obtaining witnesses and evidence not located in the United States and the difficulty of proving every element of an International Emergency

38

Economic Powers Act violation beyond a reasonable doubt."  Gov't Br. 49.[4]

Deferral of prosecution because the government is unprepared for trial is plainly

not deferral "for the purpose of allowing the defendant to demonstrate his good

conduct."  If the Government agreed to the DPA for this or another impermissible

purpose, and not "for the purpose of allowing the defendant to demonstrate his

good conduct," the DPA should be rejected even under the parties' proposed

standard.

Notably, there will often be a correlation between overly lenient DPAs and

DPAs signed for purposes other than "allowing the defendant to demonstrate his

good conduct."  Ordinarily one would expect the Government to "allow[] the

defendant to demonstrate his good conduct" in borderline cases – cases in which

there might be a technical violation of a statute, but the defendant's conduct is not

egregious, and the Government does not want to burden him with a felony

conviction if he behaves himself.  Indeed, as noted above, the legislative history

contemplated that DPAs would be used in such circumstances.  *Supra* at 35.  In

such cases, a DPA will typically *not* appear excessively lenient in light of the

defendant's sympathetic circumstances.

---

[4] The Government is more candid in this Court than it was below, when it assured
the District Court that FSBV's criminal liability was "readily provable."  JA 97.

In contrast, in cases where the defendant's conduct *is* egregious and the Government nonetheless agrees to an unusually lenient DPA, the Government may well have ulterior motives. On remand, even if the sole inquiry is whether the Government had the "purpose of allowing the defendant to demonstrate his good conduct," the District Court would act well within its discretion by inferring from the DPA's lenience that this condition is not satisfied.

## III.   THE DISTRICT COURT'S ORDER WAS CONSISTENT WITH SEPARATION-OF-POWERS PRINCIPLES.

Unable to identify any statutory restriction on the District Court's authority to deny the parties' motion for exclusion of time, the parties contend that the District Court's denial order is unconstitutional. According to the parties, separation-of-powers principles prohibit the District Court from rejecting the DPA. That argument is incorrect. In fact, it is the *parties'* position that violates the separation of powers. The parties' remarkable suggestion that the District Court was constitutionally *required* to blindly rubber-stamp the parties' motion is fundamentally inconsistent with an independent Judiciary.

### A. The Exercise of Judicial Discretion Expressly Conferred by Congress Is Not a Separation-of-Powers Violation.

The premise of the parties' separation-of-powers argument is that the District Court's order forces the Government to pursue a criminal prosecution. But it does nothing of the sort. The District Court made clear that it was "not ordering

40

or advising the Government, or the defendant, to undertake or refrain from undertaking any particular action."  JA 333.  Thus, the Government maintains the absolute discretion to try its case, negotiate a new DPA, or dismiss its case altogether, precisely as required under separation-of-powers principles.  By denying the motion to exclude time under the Speedy Trial Act, the District Court's order simply denied the Government's request to allow the Information to remain pending for 18 months.  Nothing in the Constitution affords the Executive Branch the "prosecutorial discretion" to force a court to allow a criminal case to remain dormant on its docket.  *See Clinton v. Jones*, 520 U.S. 681, 706 (1997) (noting that a district court holds the "power to control its own docket").

It is true that, by denying the motion for exclusion of time, the District Court effectively prevented the Government from resolving the case in its preferred manner.  But that poses no separation-of-powers concern.  The Government cannot always get what it wants in court.  District courts are free to reject proposed plea agreements, or to impose sentences higher than the Government's recommendation, without violating separation-of-powers principles, even though such orders result in the case being resolved in a manner the Government did not want.  *Carrigan*, 778 F.2d at 1465 (holding that refusal to accept plea agreement presents no separation-of-powers concerns).  Of course, a court may not *involve* itself in plea or DPA negotiations – that is a prosecutorial function.  But in

41

exercising the *judicial* power to accept a plea agreement or DPA, the court is perfectly entitled to disagree with the Government.  The Government now faces the difficult choice of negotiating a new agreement, trying the case, or dismissing the charges, but that is precisely the choice it faces whenever a district court rejects a plea agreement, and facing this choice is not a separation-of-powers violation.

Of course, the judicial act in this case is different than the judicial act in the context of a plea agreement; in the plea context the judge must decide whether to accept a plea, whereas here the judge must decide whether to exclude time under the Speedy Trial Act.  But the decision to exclude time under the Speedy Trial Act, like the decision to accept a plea, plainly is an exercise of the judicial power; indeed, Congress enacted the Speedy Trial Act with the intent of ensuring *independent* judicial consideration of the public interest.  *Zedner*, 547 U.S. at 501-02.  There is simply no reason why separation-of-powers principles would authorize a court to reject an agreement in the plea context, but prohibit a court from doing so in the Speedy Trial Act context.  Indeed, separation-of-powers principles demand precisely the opposite: that an Article III judge be permitted to exercise independent judgment in deciding the parties' motion, rather than being forced to follow the Government's will.  *See Nixon v. Sirica*, 487 F.2d 700, 714-15 (D.C. Cir. 1973) (government cannot invoke "separation of powers" to prevent a judge from deciding a motion lawfully before the court); *Hastings v. Judicial*

42

*Conference of U.S.*, 770 F.2d 1093, 1104 (D.C. Cir. 1985) (Edwards, J., concurring) ("[I]n order to fulfill its designated constitutional role, the judiciary must be independent in all ways that might affect substantive decisionmaking.").

Nor is there any separation-of-powers problem with the District Court's substantive review of the DPA's fairness. As noted above, district courts can and routinely do refuse to accept plea agreements on the ground that they are too lenient. *Supra*, at 43. No court has ever suggested that this practice poses separation-of-powers concerns. Indeed, a district court's consideration of the prosecutor's purposes – which the Government concedes is permissible under § 3161(h)(2) – is *worse* from a separation-of-powers perspective than a district court's consideration of a DPA's substantive fairness. When a district court considers a prosecutor's purposes, it must conduct a sensitive inquiry into the rationales for prosecutorial decision-making. By contrast, a district court's assessment of a DPA's substantive fairness, based on an objective analysis of the four corners of the Information and the DPA, is well within the judicial ken.

Moreover, as the District Court pointed out, courts have long had the "supervisory power" to "supervise the administration of criminal justice among the parties before the bar" and "protect the integrity of the judicial process." JA 328-29 (internal quotation marks and citations omitted). This reflects the broader principle that in criminal cases, the District Court has a special responsibility to

exercise independent judgment to ensure cases on their dockets are fairly resolved. FSBV observes that the Supreme Court has narrowed judges' authority to use the "supervisory power" to enact new, unenumerated rules of criminal procedure, FSBV Br. 38-42, but the District Court did nothing of the kind here – instead it exercised discretion expressly conferred by Congress.  The exercise of such congressionally-granted discretion poses no constitutional concern.

### B. If the Government Had Wanted to Avoid Judicial Scrutiny, It Should Have Signed a Non-Prosecution Agreement Rather Than a DPA.

A comparison of deferred prosecution agreements to non-prosecution agreements confirms that there is no separation-of-powers violation here.  The Government acknowledges that it could have entered into a non-prosecution agreement rather than a DPA.  Gov't Br. 8.  Under a non-prosecution agreement, the Government would agree not to charge the defendant as long as the defendant complied with the non-prosecution agreement's provisions.  To the extent the Government was concerned that the statute of limitations would expire, it could have entered into an agreement with FSBV to toll the limitations period; indeed, the parties repeatedly signed tolling agreements prior to the Information.  JA 92.

Why, then, did the Government choose to enter into a *deferred* prosecution agreement, in which it actually charged the defendant?  The Government's brief answers this question: charging FSBV, and hence initiating a judicial proceeding,

would benefit the Government by creating publicity and thus yielding greater deterrence.  Gov't Br. 8.

But although initiating judicial proceedings against a defendant carries benefits to the Government, it also has a cost: once the Government initiates judicial proceedings, a court gets involved.  Specifically, when the Government signs a non-prosecution agreement, it can stop the limitations clock through a tolling agreement without any judicial involvement.  U.S. Dep't of Justice, U.S. Attorney's Manual 9-27.600 Cmt. B.2. (1997); JA 92.  But when the Government charges a defendant, it cannot stop the Speedy Trial Act clock without judicial approval.

When the Government chose to invoke the judicial process and requested judicial approval of its motion, it took on the risk that the court would say "no." That is the hallmark of an independent judiciary: the ability to deny a motion by the prosecutor.  The Government now complains that the District Court's denial of its motion was an affront to the separation of powers, but in fact it was an unremarkable illustration of the separation of powers at work.  As the District Court pointed out, "[t]he parties are, in essence, requesting the Court to lend its judicial imprimatur to their DPA," and ask the Court "to serve as the leverage" if FSBV violates the DPA.  JA 330.  Given that the Government expressly made use

45

of the judicial power to serve its purposes, it cannot now complain that the court refused to go along.

### C. The Parties' Cases Are Readily Distinguishable.

The litany of cases cited by the parties is fully consistent with this analysis. The Government spends seven pages of its brief citing cases stating that the Government has the discretion to refuse to prosecute a defendant (Gov't Br. 25-30), or to dismiss charges once brought (Gov't Br. 30-33). Of course it does, but that principle harms rather than helps the Government. Here, as the District Court correctly stated, "the Government *has* charged Fokker Services with criminal activity. And it does not propose to dismiss the case at this point; rather, under the proposed resolution, this criminal case would remain on this Court's docket for the duration of the agreement's term." JA 329. The Government's authority uniformly establishes that the Government has the right to keep charges *off* the docket; it does not establish that the Government has a right to keep charges *on* the docket.

The Government next cites two supposedly "illustrative" cases involving plea agreements: *In re Vasquez-Ramirez*, 443 F.3d 692 (9th Cir. 2006), and *In re United States*, 345 F.3d 450 (7th Cir. 2003). Gov't Br. 33-36. But these cases are so plainly distinguishable that they illustrate the weakness of the Government's position. In *Vasquez-Ramirez*, the defendant made an unconditional guilty *plea*,

46

which the District Court had *no discretion* to reject under Federal Rule of Criminal Procedure 11(a). 443 F.3d at 695-96. The district court nonetheless rejected the plea; the Ninth Circuit unsurprisingly granted mandamus relief, while pointing out that a district court *could* have rejected a "charge bargain" plea *agreement* under Rule 11(c). *Id.* at 695 n.3, 700-01. In *In re United States*, the Government dismissed certain charges against the defendant; the district court disagreed with the Government's dismissal decision and, remarkably, appointed a private prosecutor to pursue the crimes the Government had dismissed. 345 F.3d at 451-52. In this case, the District Court did nothing but "declin[e] to approve the document before [it]," which fell squarely within its authority under § 3161(h)(2). JA 333.

The parties' citations to civil cases are equally irrelevant. The parties rely heavily on *United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995), and *SEC v. Citigroup Global Markets, Inc.*, 752 F.3d 285 (2d Cir. 2014), which reversed district court decisions rejecting consent decrees. But those cases hold that a district court may not reject a decree because of its view that the Government should have made *different* allegations, and is instead required to consider the decree's fairness in light of the allegations *actually brought*. *Microsoft*, 56 F.3d at 1457 (finding abuse of discretion because "the judge did not simply make the proper inquiry into whether the decree was appropriate to the complaint, but

47

instead asked whether the complaint itself was adequate"); *Citigroup*, 752 F.3d at 297 ("To the extent the district court withheld approval of the consent decree on the ground that it believed the S.E.C. failed to bring the proper charges against Citigroup, that constituted an abuse of discretion.").   This case is poles apart. Rather than hypothesize alternative allegations that the Government did *not* make, the District Court relied exclusively on the allegations the Government *did* make, and found that the DPA was too lenient in light of those allegations.   That is exactly what a court does when it rejects a plea agreement, and it presents no separation-of-powers concerns.

## IV.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION.

Assuming that the District Court had the discretionary authority to reject a DPA on grounds of leniency, it did not abuse its discretion here.

As an initial matter, the Court should review the District Court's exercise of discretion deferentially.   Notably, the parties do not complain about any *procedural* error committed by the District Court.   They do not contend that the District Court ignored any argument, misunderstood the record, or issued an unreasoned opinion.   Rather, their disagreement with the District Court is *substantive*: they disagree with the District Court's assessment that the DPA is grossly disproportionate to the charged crimes.   Such a case-specific assessment is the classic type of discretionary judgment warranting deferential appellate review.

48

*See, e.g.*, *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748-49 (2014) (district court's assessment of whether case was "exceptional" warranted deferential review).

There was no abuse of discretion here. The parties maintain that the District Court gave insufficient deference to the parties' prerogative to sign a DPA. Gov't Br. 45-46; FSBV Br. 47-48. But even assuming such deference was required, the District Court clearly granted it: the District Court expressly acknowledged that it should exercise its power to reject a DPA "sparingly," but found that in this particular case, the DPA was "grossly disproportionate." JA 330, 332.

That conclusion was entirely reasonable. FSBV's conduct was shockingly egregious: it knowingly and willfully violated U.S. sanctions laws *over 1,000 times*, including sales to the Iran Air Force, Iran Navy, and Iran Army. JA 38-39, 43. And the DPA was shockingly lenient: FSBV was forced to pay back *only the revenues that it gained from its illegal sales*, with no additional fines. FSBV employees who committed these serious crimes *kept their jobs*. And although FSBV promised that these lawbreakers would behave themselves, it did not even have to face the inconvenience of an independent monitor. The District Court's incredulity at the DPA was justified.

FSBV emphasizes that it disclosed its illegal conduct voluntarily, and the District Court's rejection of the DPA might create a disincentive for future

defendants to come forward.  FSBV Br. 37.  The District Court expressly acknowledged FSBV's voluntary disclosure (JA 332), and its conclusion that the DPA was nonetheless too lenient was not remotely an abuse of discretion.  It is inconceivable that a criminal defendant who voluntarily disclosed that he had sold crack cocaine or child pornography over 1,000 times would be offered a DPA if he promised to behave.  It is not clear why a defendant who gave aid and comfort to our Nation's terrorist enemies over 1,000 times should fare better.

Below, the Government justified FSBV's remarkably low fine on the ground that "the company's financial situation is extremely unstable," and imposing a higher fine might cost American jobs.  JA 154-55; *see also* Gov't Br. 48-49.  But it buried in a footnote that FSBV was the subsidiary of another, healthy company which was providing financial support.  JA 155 n.5.  At the parties' hearing, the District Court asked: "Isn't the defendant a subsidiary of a much larger corporation that is indeed a healthy corporation?"  JA 301.  FSBV's lawyer responded: "I'm not going to speak to the healthiness of the corporation."  *Id.*  On this record, and especially given the fact that America's prisons are filled with inmates subject to fines or restitution awards far exceeding their expected lifetime earnings, the District Court did not abuse its discretion in rejecting the parties' argument based on FSBV's "precarious financial condition."  JA 332.

Notably, the District Court remained open to considering a "modified version" of a DPA; it simply rejected "the document before [it]." JA 333. The District Court's careful and persuasive explanation plainly constituted a "reasoned exercise of discretion" that was not "arbitrary." *Maddox*, 48 F.3d at 558 (quotation marks omitted).

## V.    THE GOVERNMENT IS NOT ENTITLED TO A WRIT OF MANDAMUS.

The Court should deny the Government's petition for a writ of mandamus. "[T]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980). Mandamus is warranted only if three conditions are satisfied. First, "the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires"; second, the petitioner must show that its "right to issuance of the writ is clear and indisputable"; and third, "the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004) (internal quotation marks omitted) (bracket in original). None of these conditions is satisfied here.

First, there are "other adequate means to obtain the relief" desired by the Government. As previously explained, the Government is free to let the Speedy Trial Act clock run out, and then appeal after a final judgment. *Carrigan*, 778 F.2d

51

at 1467 (denying writ of mandamus challenging rejection of plea agreement because Government could appeal after final judgment).

The Government explains that relief following a final judgment would not be "adequate" because it would result in "unwanted litigation"; create "uncertainty"; and result in negative ramifications for the Government "if an appeal from dismissal failed." Gov't Br. 56. The same could be said in literally all cases involving interlocutory orders: they result in additional litigation and uncertainty, and the losing party would be worse off if an appeal after final judgment failed. This cannot possibly be enough to warrant a writ of mandamus. The Government also complains that it may "be effectively obliged" to "proceed with a plea or trial." *Id.* But that is false: the Government remains "free to return to the bargaining table to devise a settlement which would respond to [the District Court's] objections." *Dairylea*, 698 F.2d at 570. Alternatively, it can allow the Speedy Trial Act clock to wind down and then appeal. The risk that it will lose does not justify mandamus relief. Notably, this Court recently confirmed that merely invoking a separation-of-powers objection does not entitle a party to mandamus relief when it may obtain review on final judgment, and its holding applies fully here. *In re al-Nashiri*, No. 14-1203, -- F.3d --, 2015 WL 3851966, at *7 (D.C. Cir. June 23, 2015).

Second, the Government's right to mandamus relief is not "clear and undisputable."    Section 3161(h)(2) confers discretion on district courts: it states that the "approval of the court" is required for time to be excluded pursuant to a DPA, without specifying any criteria that the district court may or may not consider.  Accordingly, the District Court's consideration of the DPA's substantive fairness could not possibly have been a clear and indisputable error.  *See Allied Chem.*, 449 U.S. at 36 ("Where a matter is committed to discretion, it cannot be said that a litigant's right to a particular result is 'clear and indisputable.'" (quotation marks omitted)); *Carrigan*, 778 F.2d at 1467 (government cannot show "clear and undisputable" right to have district court accept plea agreement because such decisions are "confined almost entirely to the trial court's discretion" (internal quotation marks omitted)).  The Government maintains that § 3161(h)(2) should be construed so as to prohibit a district court from considering a DPA's substantive fairness, but there is no appellate authority construing § 3161(h)(2).  The District Court's interpretation of § 3161(h)(2) thus cannot be characterized as "clear[ly]" or "indisputabl[y]" wrong.

The Government cites several cases in which appellate courts granted mandamus in separation-of-powers cases.    Gov't Br. 57-58.  But these cases involve judges initiating their own law enforcement investigations, appointing private prosecutors, or taking other steps plainly inconsistent with the separation of

powers.  This case involves a court denying a motion for relief which, by statute, requires "approval of the court."  § 3161(h)(2).  The Government cites no case granting mandamus relief in remotely similar circumstances.

Finally, issuing the writ is not "appropriate under the circumstances."  The Government's assertion that the District Court's ruling has "potentially far-reaching consequences" is an exaggeration.  Deferred prosecution agreements have historically been a fairly unusual remedy.  Anthony S. Barkow & Rachel E. Barkow, *Introduction in Prosecutors in the Boardroom* 4 (Anthony S. Barkow & Rachel E. Barkow, eds. 2011) (stating that between 1993 and 2008, federal prosecutors used DPAs or non-prosecution agreements only 100 times).  And as the Government's brief itself observes, it can achieve the exact same result by entering into a non-prosecution agreement, which poses no risk of judicial involvement.  Gov't Br. 8.  Unlike the historic *Microsoft* antitrust litigation the Government invokes (Gov't Br. 59-60), this is not the rare case of such extraordinary importance so as to warrant mandamus review.

## VI.    REASSIGNMENT IS NOT WARRANTED.

FSBV, but not the Government, asks the Court to reassign the case to a new judge on remand.  As a threshold point, FSBV, unlike the Government, did *not* file a petition for a writ of mandamus.  Thus, if the Court dismisses the appeal for want of jurisdiction, FSBV's request for a new judge would necessarily fail.

Even if the Court exercises jurisdiction, FSBV's request for a new judge is meritless. FSBV's motion for recusal is premised entirely on the District Court's oral argument questions and the Opinion. FSBV maintains that the District Court's strongly-worded assessments of its criminal conduct demonstrate impermissible "bias."

FSBV faces an extremely high burden in arguing for recusal on this theory. A judge's "unfavorable disposition towards an individual (or his case)" does not, in and of itself, show impermissible "bias and prejudice" that mandates recusal. *Liteky v. United States*, 510 U.S. 540, 550 (1994). Rather, that unfavorable disposition warrants recusal only if it is "somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess." *Liteky*, 510 U.S. at 550. Thus, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge," unless "they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* at 555.

The District Court's statements do not meet that standard. Indeed, in Amicus's view, the District Court's statements are accurate and appropriate in all respects, and FSBV's assertions of "bias" merely show its refusal to accept responsibility for its egregious criminal conduct.

55

FSBV contends that the District Court was biased because it "harbored views about Iran – and companies that have done business with Iran." FSBV Br. 51. It bases this argument on the District Court's statements that FSBV's conduct was "extremely serious" and that Iran is "one of the major enemies of this country." *Id.* FSBV seems to have forgotten the entire reason that its sales to Iran were illegal: they violated the U.S. Government's sanctions regime, which is premised on its determination that Iran represents "an unusual or extraordinary threat to the national security, foreign policy, and economy of the United States," presenting a "national emergency." JA 58-59. Contrary to FSBV's assertion, Iran is not a "*so-called* enem[y] of the United States," FSBV Br. 54 (emphasis added); it *is* an enemy. FSBV's argument that the District Court impermissibly "harbored views" about "companies that have done business with Iran" is the equivalent of a child pornography dealer accusing a judge of "bias" because he "harbored views" that selling child pornography is serious criminal conduct.

FSBV also argues that the District Court was biased against FSBV itself: it accuses the court of being "fixated on [its] alleged past business dealings with Iranian entities." FSBV Br. 57. This argument is remarkable. Even setting aside the fact that these business dealings are more than just "*alleged*" – FSBV admitted to them, chapter and verse – the District Court was not "biased" for being "fixated" on *the precise course of criminal conduct charged in the Information.* Equally

56

unpersuasive is FSBV's complaint that the District Court referred to it as a "rogue" company.  FSBV Br. 56.  "A judge's candid reflections of what he has inferred from the [proceedings] about the defendant's character and conduct simply do not establish bias or prejudice."  *In re Barry*, 946 F.2d 913, 914 (D.C. Cir. 1991).  Indeed, given that FSBV has admitted that it willfully violated U.S. sanctions laws over 1,000 times and assisted the Iranian military, calling FSBV a "rogue" company is an understatement.

FSBV's remaining arguments for recusal similarly fail.  FSBV argues that the District Court impermissibly "rel[ied] on anonymous allegations in a news article" which suggested FSBV might not have acted voluntarily.  FSBV Br. 51-52.  But the record establishes that the District Court did *not* rely on the news article: after soliciting briefing from the parties, the District Court explicitly concluded based on that briefing that FSBV's conduct *was* voluntary.  JA 332 n.4.  FSBV also complains that the District Court "prob[ed] outside the record for 'any other cases . . . involving deferred prosecution agreements where the company in question was engaged in transactions of a similar kind as this . . . .'"  FSBV Br. 51-53.  But there is nothing improper about a judge asking the Government about comparable cases.  Indeed, during sentencing, a judge is *required* to undertake such an inquiry.  18 U.S.C. § 3553(a)(6) (court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have

been found guilty of similar conduct").  As for FSBV's complaints about the District Court's observations that selling weapons to Iran is of particular concern in a "post-9/11 world" during a "two-front War against terror," (FSBV Br. 54), these observations do not show "bias," but rather that the District Court is not completely disconnected from reality.

This case is closely comparable to *SEC v. First City Financial Corp.*, 890 F.2d 1215 (D.C. Cir. 1989).  In *First City Financial*, a party sought recusal on the basis of the judge's disparaging comments about the defendants, including by referring to them as "active corporate raiders" and "greenmailers."  890 F.2d at 1221-22.  Despite finding that such comments "suggest that the district judge did not admire" and even had "distaste" for the defendants' actions, the court found that they do not constitute "judicial bias."  *Id.* at 1222.  As the Court explained, "[e]ven where a judge expresses his views on law or policy, that 'preconception' may not provide the basis for a reversal if the judge still 'is capable of refining his views . . . and maintaining a completely open mind to decide the facts and apply the applicable law to the facts.'"  *Id.* at 1222 (citation omitted) (ellipsis in original). Here, the district judge's comments regarding Iran and the "War against terror" were similarly "express[ions of] his views on . . . policy."  And FSBV has made no showing that the judge's ultimate opinion rejecting the DPA as "grossly disproportionate to the gravity of Fokker Services' conduct," JA 332, did not

58

reflect the judge "decid[ing] the facts and apply[ing] the applicable law to the facts," 890 F.2d at 1222.

FSBV ignores *First City Financial* and instead relies on *Cobell v. Kempthorne*, 455 F.3d 317 (D.C. Cir. 2006), in which this Court directed the district judge to recuse himself. But that was a case in which the district court had referred to the Department of the Interior as "the last pathetic outpost of the indifference and anglocentrism we thought we had left behind," threatened to put the entire Department into receivership, and had been reversed by this Court eight separate times, including on two occasions when the district court ordered all of the Department's computers disconnected from the Internet. *Id.* at 332-35 (quotation marks omitted). This case is not comparable.

## CONCLUSION

The appeals should be dismissed for lack of jurisdiction, or in the alternative, the judgment of the District Court should be affirmed. The petition for mandamus should be denied.

July 2, 2015                                        Respectfully submitted,

                                          /s/ David W. DeBruin
                                          DAVID W. DEBRUIN
                                             *Lead Counsel*
                                          ADAM G. UNIKOWSKY
                                          JULIE STRAUS HARRIS
                                          JENNER & BLOCK LLP
                                          1099 New York Avenue NW
                                          Suite 900
                                          Washington, DC 20001
                                          202-639-6000
                                          ddebruin@jenner.com
                                          aunikowsky@jenner.com
                                          jstrausharris@jenner.com

                                          *Counsel for Amicus Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitations of Fed. R. App. P. 29(d) because it contains 13,760 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14-point font.

/s/ Adam G. Unikowsky
ADAM G. UNIKOWSKY
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
202-639-6000
aunikowsky@jenner.com

*Counsel for Amicus Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of July, 2015, a true and correct copy of

the foregoing was filed with the Clerk of the United States Court of Appeals for the

D.C. Circuit via the Court's CM/ECF system, which will send notice of such filing

to all counsel who are registered CM/ECF users.

<u>/s/ Adam G. Unikowsky</u>
ADAM G. UNIKOWSKY
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
202-639-6000
aunikowsky@jenner.com

*Counsel for Amicus Curiae*

# STATUTORY ADDENDUM

# INDEX

18 U.S.C. § 3161 ...................................................................... S.A. - 1

28 U.S.C. § 1291 ...................................................................... S.A. - 7

28 U.S.C. § 1292(a) ................................................................. S.A. - 8

**18 U.S.C.A. § 3161**

§ 3161. Time limits and exclusions

(a) In any case involving a defendant charged with an offense, the appropriate judicial officer, at the earliest practicable time, shall, after consultation with the counsel for the defendant and the attorney for the Government, set the case for trial on a day certain, or list it for trial on a weekly or other short-term trial calendar at a place within the judicial district, so as to assure a speedy trial.

(b) Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges. If an individual has been charged with a felony in a district in which no grand jury has been in session during such thirty-day period, the period of time for filing of the indictment shall be extended an additional thirty days.

(c)　　(1) In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs. If a defendant consents in writing to be tried before a magistrate judge on a complaint, the trial shall commence within seventy days from the date of such consent.

　　　　(2) Unless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se.

(d)　　(1) If any indictment or information is dismissed upon motion of the defendant, or any charge contained in a complaint filed against an individual is dismissed or otherwise dropped, and thereafter a complaint is filed against such defendant or individual charging him with the same offense or an offense based on the same conduct or arising from the same criminal episode, or an information or indictment is filed charging such defendant with the same offense or an offense based on the same conduct or arising from the same criminal episode, the provisions of subsections (b) and (c) of

this section shall be applicable with respect to such subsequent complaint, indictment, or information, as the case may be.

(2) If the defendant is to be tried upon an indictment or information dismissed by a trial court and reinstated following an appeal, the trial shall commence within seventy days from the date the action occasioning the trial becomes final, except that the court retrying the case may extend the period for trial not to exceed one hundred and eighty days from the date the action occasioning the trial becomes final if the unavailability of witnesses or other factors resulting from the passage of time shall make trial within seventy days impractical. The periods of delay enumerated in section 3161(h) are excluded in computing the time limitations specified in this section. The sanctions of section 3162 apply to this subsection.

(e) If the defendant is to be tried again following a declaration by the trial judge of a mistrial or following an order of such judge for a new trial, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final. If the defendant is to be tried again following an appeal or a collateral attack, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final, except that the court retrying the case may extend the period for retrial not to exceed one hundred and eighty days from the date the action occasioning the retrial becomes final if unavailability of witnesses or other factors resulting from passage of time shall make trial within seventy days impractical. The periods of delay enumerated in section 3161(h) are excluded in computing the time limitations specified in this section. The sanctions of section 3162 apply to this subsection.

(f) Notwithstanding the provisions of subsection (b) of this section, for the first twelve-calendar-month period following the effective date of this section as set forth in section 3163(a) of this chapter the time limit imposed with respect to the period between arrest and indictment by subsection (b) of this section shall be sixty days, for the second such twelve-month period such time limit shall be forty-five days and for the third such period such time limit shall be thirty-five days.

(g) Notwithstanding the provisions of subsection (c) of this section, for the first twelve-calendar-month period following the effective date of this section as set forth in section 3163(b) of this chapter, the time limit with respect to the period between arraignment and trial imposed by subsection (c) of this section shall be one hundred and eighty days, for the second such twelve-month period such time

limit shall be one hundred and twenty days, and for the third such period such time limit with respect to the period between arraignment and trial shall be eighty days.

(h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:

(1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to--

(A) delay resulting from any proceeding, including any examinations, to determine the mental competency or physical capacity of the defendant;

(B) delay resulting from trial with respect to other charges against the defendant;

(C) delay resulting from any interlocutory appeal;

(D) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;

(E) delay resulting from any proceeding relating to the transfer of a case or the removal of any defendant from another district under the Federal Rules of Criminal Procedure;

(F) delay resulting from transportation of any defendant from another district, or to and from places of examination or hospitalization, except that any time consumed in excess of ten days from the date an order of removal or an order directing such transportation, and the defendant's arrival at the destination shall be presumed to be unreasonable;

(G) delay resulting from consideration by the court of a proposed plea agreement to be entered into by the defendant and the attorney for the Government; and

(H) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.

(2) Any period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct.

(3)   (A) Any period of delay resulting from the absence or unavailability of the defendant or an essential witness.

(B) For purposes of subparagraph (A) of this paragraph, a defendant or an essential witness shall be considered absent when his whereabouts are unknown and, in addition, he is attempting to avoid apprehension or prosecution or his whereabouts cannot be determined by due diligence. For purposes of such subparagraph, a defendant or an essential witness shall be considered unavailable whenever his whereabouts are known but his presence for trial cannot be obtained by due diligence or he resists appearing at or being returned for trial.

(4) Any period of delay resulting from the fact that the defendant is mentally incompetent or physically unable to stand trial.

(5) If the information or indictment is dismissed upon motion of the attorney for the Government and thereafter a charge is filed against the defendant for the same offense, or any offense required to be joined with that offense, any period of delay from the date the charge was dismissed to the date the time limitation would commence to run as to the subsequent charge had there been no previous charge.

(6) A reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted.

(7)   (A) Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest

of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

(B) The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are as follows:

> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.

> (ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

> (iii) Whether, in a case in which arrest precedes indictment, delay in the filing of the indictment is caused because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or because the facts upon which the grand jury must base its determination are unusual or complex.

> (iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

(C) No continuance under subparagraph (A) of this paragraph shall be granted because of general congestion of the court's calendar, or lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government.

(8) Any period of delay, not to exceed one year, ordered by a district court upon an application of a party and a finding by a preponderance of the evidence that an official request, as defined in section 3292 of this title, has been made for evidence of any such offense and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

(i) If trial did not commence within the time limitation specified in section 3161 because the defendant had entered a plea of guilty or nolo contendere subsequently withdrawn to any or all charges in an indictment or information, the defendant shall be deemed indicted with respect to all charges therein contained within the meaning of section 3161, on the day the order permitting withdrawal of the plea becomes final.

(j)     (1) If the attorney for the Government knows that a person charged with an offense is serving a term of imprisonment in any penal institution, he shall promptly--

        (A) undertake to obtain the presence of the prisoner for trial; or

        (B) cause a detainer to be filed with the person having custody of the prisoner and request him to so advise the prisoner and to advise the prisoner of his right to demand trial.

(2) If the person having custody of such prisoner receives a detainer, he shall promptly advise the prisoner of the charge and of the prisoner's right to demand trial. If at any time thereafter the prisoner informs the person having custody that he does demand trial, such person shall cause notice to that effect to be sent promptly to the attorney for the Government who caused the detainer to be filed.

(3) Upon receipt of such notice, the attorney for the Government shall promptly seek to obtain the presence of the prisoner for trial.

(4) When the person having custody of the prisoner receives from the attorney for the Government a properly supported request for temporary custody of such prisoner for trial, the prisoner shall be made available to that attorney for the Government (subject, in cases of interjurisdictional transfer, to any right of the prisoner to contest the legality of his delivery).

(k)    (1) If the defendant is absent (as defined by subsection (h)(3)) on the day set for trial, and the defendant's subsequent appearance before the court on a bench warrant or other process or surrender to the court occurs more than 21 days after the day set for trial, the defendant shall be deemed to have first appeared before a judicial officer of the court in which the information or indictment is pending within the meaning of subsection (c) on the date of the defendant's subsequent appearance before the court.

(2) If the defendant is absent (as defined by subsection (h)(3)) on the day set for trial, and the defendant's subsequent appearance before the court on a bench warrant or other process or surrender to the court occurs not more than 21 days after the day set for trial, the time limit required by subsection (c), as extended by subsection (h), shall be further extended by 21 days.

## 28 U.S.C.A. § 1291

§ 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**28 U.S.C.A. § 1292(a)**

§ 1292. Interlocutory decisions

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

> (1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

> (2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

> (3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

* * * *